APALLA U. CHOPRA (S.B. #163207)
  achopra@omm.com
DIMITRI PORTNOI (S.B. #282871)
  dportnoi@omm.com
O'Melveny & Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone:  (213) 430-6000
Facsimile:   (213) 430-6407

MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
PATRICK S. MCNALLY (S.B. #302062)
  pmcnally@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

Attorneys for Defendants
San Marino Unified School District, San
Marino Unified School District Board of
Education, Shelley Ryan, Lisa Link, Nam Jack,
C. Joseph Chang, Alexander Cherniss, and
Linda de la Torre

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN

| | |
|---|---|
| CHRISTOPHER NORGAARD,<br><br>Plaintiff,<br><br>v.<br><br>SAN MARINO UNIFIED SCHOOL DISTRICT, *et al.*,<br><br>Defendants. | Case No. 2:18-cv-04987-FMO (GJSx)<br><br>**OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>Hearing Date:  N/A<br>Time:  N/A<br>Place:  Courtroom 6D<br>Judge:  The Hon. Fernando M. Olguin |

1
2

**TABLE OF CONTENTS**

**Page**

3    I.    INTRODUCTION ................................................................. 1

4    II.   FACTUAL AND PROCEDURAL BACKGROUND ....................................... 2

5          A.    The SMUSD and Norgaard's Service on the Board ............................ 2

6          B.    Complaints About Norgaard's Conduct and SMUSD's Response ....... 3

7          C.    Norgaard's Disregard for SMUSD Directives and Retaliation ............. 5

8          D.    The Investigation Report and Aftermath ................................ 6

9          E.    Norgaard's Suit and the Formation of the Evaluation Committee ........ 7

10   III.   THE COURT SHOULD DENY NORGAARD'S MOTION. ........................ 9

11         A.    Norgaard Waited Too Long to File This *Ex Parte* Application. ......... 10

12         B.    Norgaard's Claims Have No Merit. ...................................... 13

13               1.    Legal Background ................................................ 14

14               2.    The Numerous Reasons Norgaard's Claim Fails. ................. 156

15         C.    Norgaard Cannot Show Irreparable Injury. ........................... 20

16         D.    The Balance of Equities and the Public Interest Favor Defendants. . 201

17   IV.    CONCLUSION ................................................................ 22

18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bauer v. Shepard,*
  620 F.3d 704 (7th Cir. 2010) ...................................................................... 15

*Blair v. Bethel School District,*
  608 F.3d 540 (9th Cir. 2010) ......................................................... 15, 17, 18, 21

*Bond v. Floyd,*
  385 U.S. 116 (1966) ...................................................................................... 17

*Bus. Guides, Inc. v. Chromatic Commc'ns Enterps.,*
  892 F.2d 802 (9th Cir. 1989) ........................................................................ 13

*Cal. Primary Care Ass'n v. Douglas,*
  2012 WL 12930701 (N.D. Cal. May 10, 2012) .............................................. 21

*Chula Vista Citizens for Jobs & Fair Competition v. Norris,*
  782 F.3d 520 (9th Cir. 2015) .................................................................... 15, 16

*Church of Scientology of Calif. v. United States,*
  920 F.2d 1481 (9th Cir. 1990) ...................................................................... 20

*Connick v. Myers,*
  461 U.S. 138 (1983) ................................................................................. 14, 21

*CTIA-The Wireless Ass'n v. City of Berkeley, California,*
  854 F.3d 1105 (9th Cir. 2017) ...................................................................... 20

*Elrod v. Burns,*
  427 U.S. 347 (1976) ...................................................................................... 20

*Family Tr. Found. of Kentucky, Inc v. Wolnitzek,*
  345 F. Supp. 2d 672 (E.D. Ky. 2004) ........................................................... 15

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) ...................................................................................... 15

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) .......................................................................... 9

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Gastroceuticals, LLC v. Diamond Water, LLC,*
   2013 WL 12089476 (C.D. Cal. Dec. 23, 2013) ...................................................12

*Gonzalez v. Diversified Real Prop. Mgmt. & Bus. Servs., Inc.,*
   2010 WL 10105755 (C.D. Cal. Jan. 4, 2010)......................................................19

*Guarantee Co. of N. Am. USA v. Wall,*
   2013 WL 12205048 (C.D. Cal. Oct. 22, 2013) ...................................................12

*Harris v. State Personnel Bd.,*
   170 Cal. App. 3d 639 (1985) ...............................................................................11

*Ins. Servs. Office, Inc. v. ISO Rater Corp.,*
   2016 WL 9185311 (C.D. Cal. Mar. 4, 2016) ......................................................12

*Kelly v. Univ. Press of Miss.,*
   2016 WL 9223795 (C.D. Cal. May 3, 2016).......................................................12

*Levian v. City of Los Angeles,*
   2015 WL 12662339 (C.D. Cal. Sept. 24, 2015)..................................................13

*Liteky v. United States,*
   510 U.S. 540 (1994) .............................................................................................15

*Loan Payment Admin. LLC v. Hubanks,*
   2015 WL 1245895 (N.D. Cal. Mar. 17, 2015)....................................................20

*Marken v. Santa Monica-Malibu Unified Sch. Dist.,*
   202 Cal. App. 4th 1250 (2012)..............................................................................5

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ...............................................................................................9

*Mendocino Envtl. Ctr. v. Mendocino Cty.,*
   14 F.3d 457 (9th Cir. 1994) .................................................................................19

*Miramar Brands Grp., Inc. v. Fonoimoana,*
   2016 WL 9308016 (C.D. Cal. June 24, 2016)....................................................12

*Mission Power Eng'g Co. v. Cont'l Cas. Co.,*
   883 F. Supp. 488 (C.D. Cal. 1995)................................................................11, 13

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Montgomery v. Pac. Elec. Ry. Co.*,
 258 F. 382 (9th Cir. 1919) ................................................................. 18

*Nev. Comm'n on Ethics v. Carrigan*,
 564 U.S. 117 (2011) ........................................................................ 15

*Nken v. Holder*,
 556 U.S. 418 (2009) ........................................................................ 20

*Paul v. Davis*,
 424 U.S. 693 (1976) ........................................................................ 13

*Pennhurst St. School & Hosp. v. Halderman*,
 465 U.S. 89 (1984) .................................................................... 14, 22

*Siegert v. Gilley*,
 500 U.S. 226 (1991) ........................................................................ 13

*Slaughter-House Cases*,
 83 U.S. 36 (1873) ............................................................................ 13

*Tabaddor v. Holder*,
 156 F. Supp. 3d 1076 (C.D. Cal. 2015) ............................................ 18

*Taylor v. Nabors Drilling USA, LP*,
 222 Cal. App. 4th 1228 (2014) .......................................................... 6

*Thomas v. Carpenter*,
 881 F.2d 828 (9th Cir. 1989) ...................................................... 18, 19

*Thompson v. City of Monrovia*,
 186 Cal. App. 4th 860 (2010) ............................................................ 5

*Toussaint v. McCarthy*,
 801 F.2d 1080 (9th Cir. 1986) .......................................................... 14

*Yanowitz v. L'Oreal USA, Inc.*,
 36 Cal.4th 1028 (2005) .................................................................... 19

**Statutes**

Cal. Code. Civ. Proc. § 425.16 ............................................................... 8

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Cal. Gov. Code § 12940 ........................................................................4, 19

Cal. Gov. Code § 905 .................................................................................11

Cal. Gov. Code § 945.4 .............................................................................11

**Other Authorities**

92 Cal. Op. Att'y Gen. 19 (2009) .......................................................16, 17

**Rules**

C.D. Cal. L.R. 7-19.1 ................................................................................12

C.D. Cal. L.R. 79-5.2.2 .............................................................................13

Cal. Rules of Prof'l Responsibility R. 5-200(B) ......................................19

Fed. R. Civ. P. 11......................................................................................13

# I.     INTRODUCTION

Mr. Norgaard's lawsuit and pending injunction request—which by their express terms ask this Article III court to police the "policy, tradition, and practice" (whatever that may mean) of a local school board as it evaluates its Superintendent of Schools, *see* Dkt. 25-2:13-16—might well present the least meritorious TRO application filed in a non-*pro se* case this year.  The application is untimely by over a month.  The relief requested was already largely afforded Norgaard.  And the one federal claim on which he rests the application (among the many vague claims *not* pressed) lacks any merit as a matter of fact and well-established, controlling law.

The relief Norgaard seeks—further participation in Superintendent Cherniss' evaluation—also places the District in jeopardy of violating California's anti-discrimination laws.  The Board had Norgaard recuse himself from the evaluation because he was the subject of a *pending investigation* that he had retaliated against Cherniss and others for their having initiated a legally required investigation into documented claims that Norgaard kissed, improperly communicated with, and made uncomfortable district employees.  California law and the Board's own rules fully empowered the Board to create the special evaluation committee it used.

Norgaard ignores these authorities.  Instead he and counsel have waged a media campaign attacking the District and the many improperly named individual defendants, even "explaining" the Court's adverse rulings in the press.  *Infra* n.8.  The pattern of intimidation also includes Norgaard's visiting his accusers, threatening Cherniss' job, and calling the family member of another accuser.

Norgaard claims that his First Amendment rights were violated by not being permitted to vote on board matters.  The reality is that he continues to vote on all items that come before the Board, including votes this past week.  Indeed, when the Board voted on his recusal in May, he made a long speech and lost 4 to 1.  He claims the Board cannot form a special committee, citing off-point bylaws and policies.  Norgaard's selective and disingenuous reading of these sources does not

rise and cannot give rise to a federal claim, much less a constitutional tort. Were it otherwise, federal courts would have to oversee local board recusal decisions—a notion that federal law flatly rejects.

In any event, Norgaard has made his new negative views about Cherniss well known: in evaluation forms and comments he provided the Board; stories he fed to the press; conversations he initiated with school employees; and this lawsuit. The Board has not stifled speech. What is most telling, however, is that, in *late 2017*, Norgaard *himself* nominated Cherniss as the "Superintendent of the Year." Only after Cherniss and his team followed their legal obligations to begin the now two independent investigations into Norgaard's unprofessional conduct is Norgaard seeking yet another chance to slam Cherniss in his now all-but-complete evaluation. The Board's vote to exclude Norgaard from the evaluation made perfect sense.

Perhaps the most important fact in deciding this motion, however, is when the Board's recusal vote occurred: May 8, 2018. Norgaard waited *five weeks* after that date to first file his complaint and TRO, and on that ground alone, this pending application should be denied. Indeed, the Board president was prepared to deliver Cherniss' review *this week*. By contract, the review process should done now. But given this pending TRO, the Board president is delaying this work.

The bottom-line is that Norgaard did engage in unwanted kissing of District personnel; this and other conduct made District employees deeply uncomfortable. The District took tailored measures to address these issues. Norgaard's TRO, which seeks to punish anyone who dare hold him accountable to the same rules that apply to everyone else in the District, should be denied. (This misguided case should be also dismissed, and defendants will move for that dismissal shortly.)

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The SMUSD and Norgaard's Service on the Board

The San Marino Unified School District ("SMUSD") oversees the education of over 3,000 students in San Marino, California. It is recognized as one of the best

school districts in the United States.  Decl. of Dr. Alex Cherniss ("CD") ¶ 1.  A five-member Board of Education ("Board") oversees SMUSD, and day-to-day operations are led by Cherniss and his staff.  The voters of San Marino elect school board members.  Decl. of Lisa Link ("LD") ¶ 4.  Each Board member is at-large, unlike other districts in which members represents only a part of the district.  *Id.* Among other duties, the Board approves an annual budget, approves changes to curriculum, and is responsible for hiring and evaluating the Superintendent.  *Id.* ¶ 5. In addition to Norgaard, the members of the SMUSD Board are Shelley Ryan (president), Lisa Link (vice president), Nam Jack, and C. Joseph Chang.  *Id.* ¶ 6. Cherniss has been superintendent since 2014.  Linda de la Torre, a 29-year veteran of SMUSD, is assistant superintendent for human resources.  CD ¶ 3.

Norgaard concedes (as he must) that prior to this year, he had a positive view of Cherniss and his performance.  Decl. of Chris Norgaard, Dkt. 25-1 ("ND"), at 6 ("I have in the past had a good and friendly relationship with [Cherniss].").  Indeed, in *late 2017*, Norgaard nominated Cherniss as Los Angeles County "Superintendent of the Year."  Decl. of Shelley Ryan ("RD") Ex. A.  In the nomination form, Norgaard applauded Cherniss for keeping "SMUSD at the top of state academic performance rankings," "[g]reat leadership for learning," "envision[ing] and implement[ing] funding and design" for new facilities, and "implement[ing] quantum leaps in professional development."  *Id*.

Norgaard's views on Cherniss—and his objectivity—changed, however, after SMUSD fulfilled its legal obligations to investigate credible allegations that Norgaard engaged in sexual harassment and other inappropriate behavior.

**B.    Complaints About Norgaard's Conduct and SMUSD's Response**

In January 2018, two female SMUSD employees separately alerted the District to allegedly inappropriate behavior by Norgaard:

*Jane Doe 1.*  One employee provided a written statement on January 19, 2018, about two disturbing incidents in which Norgaard hugged her and kissed her

OPP. TO PLS.' TRO APPLICATION
2:18-CV-04987-FMO (GJSX)

on the lips at separate SMUSD events.  CD ¶ 5.  She felt "uncomfortable" and "very embarrassed" by the incidents and "tried to avoid being in any situation where physical contact with him would be possible."  *Id.*  She later explained that she felt that Norgaard had "taken advantage of [her] vulnerabilities as his subordinate," since he was a long-serving Board member "perceived by many to have a lot of power and influence in the community and certainly over [SMUSD] employees."  *Id.*, Ex. H (Apr. 9, 2018 statement).

*Jane Doe 2.*  Another employee told de la Torre that a teacher had reported that Norgaard gave "sloppy kisse[s]" to staff members, which made her feel uncomfortable.  *Id*. ¶ 5.  While some noted that the kisses did not bother them, this employee felt it was inappropriate.  She further noted that Norgaard (unlike any others) made it a habit to stop and visit with new, young, female staffers.  *Id.*

These were not the first allegations made to SMUSD about Norgaard.  When Cherniss became superintendent in 2014, he was informed that, in 2010, two women made complaints concerning alleged sexual misconduct against Norgaard ("Jane Doe 3" and "Jane Doe 4"), neither of whom was a SMUSD employee.  A prior superintendent raised the claims with Norgaard, who denied them.  CD ¶ Ex. ¶ 7 & Ex. A (2010 email).  In addition, in March 2015, a female SMUSD employee ("Jane Doe 5") alerted SMUSD leadership that she was regularly receiving text messages from Norgaard during work and non-work hours that had no relevance or relationship to her job with the SMUSD.  *Id.* ¶ 7.[1]

The law imposes on SMUSD a duty to investigate workplace harassment, even when perpetrated by non-employees such as Norgaard.  *E.g.*, Cal. Gov. Code § 12940(j) (requiring employers to take "immediate and appropriate corrective action" in response to sexual harassment allegations, including alleged "acts of nonemployees").  Given the past complaints, SMUSD's then legal counsel (not the

---

[1] SMUSD spoke with Norgaard about the allegations, but took no further action per Jane Doe 5's request.  *Id.*

OPP. TO PLS.' TRO APPLICATION
2:18-CV-04987-FMO (GJSX)

undersigned firm) retained Nicole Miller & Associates to conduct an independent investigation.  Norgaard's misconduct did not cease.

### C.    Norgaard's Disregard for SMUSD Directives and Retaliation

On January 22, 2018, Cherniss and de la Torre met with Norgaard and gave him a letter informing him that "allegations of sexual assault [had been] made against [him] involving District employees," that SMUSD "takes such allegations very seriously," and that it initiated an investigation.  CD Ex. B.  Norgaard was told to refrain from visiting SMUSD campuses and to avoid contact with SMUSD employees while the investigation was pending, absent prior approval.  *Id.*  This interim measure was designed to "ensure the propriety of the investigation and to provide a safe campus for our employees."  *Id.*; *see Thompson v. City of Monrovia*, 186 Cal. App. 4th 860, 880 (2010) ("An employer who knows or should have known of unlawful harassment and retaliation, and fails to take immediate and appropriate corrective action, may be liable for the resulting damages.").

Later that evening, Norgaard called Cherniss to express his displeasure with the meeting, and told him that the allegations and investigation better not be made public.  CD ¶ 10.  Cherniss—a SMUSD employee protected by anti-retaliation laws—interpreted Norgaard's statements as a threat.  *Id.*  Norgaard, who is an elected official and public figure, could not demand any sort of cover-up.[2]

---

[2] *Cf., e.g.*, *Marken v. Santa Monica-Malibu Unified Sch. Dist.*, 202 Cal. App. 4th 1250, 1276 (2012) (finding release of an investigation report and disciplinary record regarding a teacher's alleged sexual harassment was required under the California Public Records Act).

The SMUSD had no intention to publicize the investigation, but did report the complaints to the local police.  On January 29, the San Marino Police Department chose to issue a press release stating that it was investigating allegations made against a board member.  CD ¶ 11 & Ex. C.  The SMUSD received press inquiries asking it to confirm sources that Norgaard (and not the other male board member) was the subject.  SMUSD gave a brief, written statement confirming that Norgaard was the subject of a sexual harassment investigation, refusing to provide details, and confirming that he remained an active member of the Board.  *Id.* Ex. D.

OPP. TO PLS.' TRO APPLICATION
2:18-CV-04987-FMO (GJSX)

Almost immediately after receiving the January 22 directive to abstain from visiting SMUSD campuses without the superintendent's permission, Norgaard disregarded it.  On January 26, he went to the San Marino High School campus without receiving or even seeking prior approval.  SMUSD once again wrote to Norgaard and reiterated that he was not to go to any campuses absent express authorization from Cherniss, and that his "failure to follow the … directives threatened the integrity of the investigation."  *Id.* Ex. E.

In the midst of the investigation, Norgaard again made what Cherniss thought was a retaliatory threat.  On March 12, for the first time since Cherniss became superintendent, Norgaard requested a copy of Cherniss' employment contract, even though it was a public document and Norgaard had helped negotiate it.  *Id*. Ex. F.  As Cherniss explained at the time, "[t]here is no other reason"—apart from threatening and retaliating against him—to request, "for the first time in almost four years," to review the terms of his employment agreement.  *Id*.[3]

### D.    The Investigation Report and Aftermath

On March 22, 2018, Miller completed its investigation.  Norgaard has falsely claimed in this lawsuit, the press, Board meetings, and elsewhere that Miller's team exonerated him.  *E.g.*, Dkt. 1 ¶ 38; Dkt. 25 at 1; *infra* n.8.  Not so.  The report found that claims about his unwanted actions were credible and "substantiated."  CD Ex. G at 2.  Among other findings that Norgaard omits from his brief, Miller observed that Norgaard "did, at times, engage in unsolicited hugging and kissing of female [SMUSD] employees," making them uncomfortable.  *Id.* at 2-3.  Norgaard "was commonly described as someone who at times fails to recognize professional boundaries and may not pick up on social cues in his interactions with others."  *Id.* at 4.  And while the report stated that his conduct did not amount to "sexual harassment" because his actions were not "sexually motivated," *id*. at 1, 4, the

---

[3] And this request for the contract came, of course, just four months after Norgaard nominated Cherniss for "Superintendent of the Year."  *Supra* at 3.

report did not cite or follow the governing legal test in California for harassment claims.[4]  Moreover, one accuser soon disputed Norgaard's explanation for his conduct:  "I do believe that the kisses were sexually motivated.  Why else would have kiss me on the lips?  How many people do you know who get kissed on the lips by their [boss] at work?  I felt uncomfortable because I knew it wasn't appropriate."  CD Ex. H.

The Miller report speculated that Norgaard would learn his lesson.  CD Ex. G at 4 ("Norgaard appeared to understand how his behavior could be perceived as a concern ….  [We] find[] it highly likely that as [a] result of this investigation, [he] would be willing to abide by clarified and reasonable guidelines as to his behavior moving forward.").  This speculation was too optimistic.  On April 4, 2018—just days after Norgaard received a copy of the report, Jane Doe 2 told the District that she felt uncomfortable because Norgaard made unannounced and unnecessary visits to SMUSD and spoke with her.  CD ¶ 16.  Jane Doe 1 reported that she felt uncomfortable, too, as Norgaard had taken steps to intimidate her, and she was concerned she would lose her job.  CD Ex. H at 1-2.  And a former employee, interviewed as part of the first investigation ("Jane Doe 6"), raised concerns.  After the release of Miller's report, Norgaard *twice* attempted to contact Jane Doe 6's family member—someone whom Norgaard barely knew.  *Id.* ¶ 16.

On May 31, 2018, in response to these acts of retaliation, SMUSD launched a second investigation, led by another law firm.  The investigation is pending.  *Id.*

### E.    Norgaard's Suit and the Formation of the Evaluation Committee

During the events above, Norgaard sent claim notices on April 23, 2018, to SMUSD, Cherniss, and de la Torre pursuant to the California Tort Claims Act.  CD Ex. I.  Attached was a draft complaint for defamation and other torts.  The lawsuit

---

[4] "California courts have recognized that a sexual motive or interest is not required for sexual harassment under the FEHA."  *Taylor v. Nabors Drilling USA, LP*, 222 Cal. App. 4th 1228, 1240 (2014).

1   was classic retaliatory behavior, aimed at punishing the SMUSD and its leadership

2   for investigating substantiated allegations of sexual harassment. (Norgaard dropped

3   the defamation claim from his federal lawsuit likely because it would be dismissed,

4   pursuant to California's anti-SLAPP statute. *See* Cal. Code. Civ. Proc. § 425.16.

5   He is a public figure, and the statements he challenges were all true.)

6        At the time Norgaard served his notice, the Board was in the midst of its

7   annual evaluation of Cherniss. LD ¶¶ 8-11. The Board initially intended to discuss

8   the evaluation at its February 26, 2018 meeting. Norgaard, however, did not attend,

9   and the Board decided not to start the evaluation at that meeting. *Id*. Norgaard also

10  did not attend the March 13 meeting. Prior to the April 10 meeting, board president

11  Ryan sent Norgaard a reminder to complete his evaluation and to send her a copy

12  by April 7. RD ¶ 3 Ex. B. Norgaard did not do so, and instead later gave her

13  handwritten comments. *Id*. At a closed-session portion of the April 10 Board

14  meeting, all members of the Board, including Norgaard, had a discussion of

15  Cherniss' performance and his evaluation. LD ¶ 10.

16       Norgaard's disruptions continued and he had filed notice of a legal claim

17  against Cherniss, so the Board decided on May 8—after open debate, involving

18  Norgaard, *id.* Ex. B at 8-11—that it was inappropriate for Norgaard to evaluate

19  Cherniss. The Board's bylaws expressly required Norgaard to recuse himself: "A

20  Board member shall abstain from any official action in which his/her private or

21  personal interest may conflict with his/her official duties." *Id.* Ex. A. Norgaard

22  disregarded this mandate and demanded to participate in the evaluation.

23       Norgaard's participation in the evaluation process would have been deeply

24  troubling because under the terms of Cherniss' contract, his compensation and

25  employment are tied in part to numeric scores in his annual evaluation. LD, Ex. B

26  at 5-6. A negative evaluation from Norgaard—which he could skew with

27  abnormally low numerical scores—could result in an unsatisfactory rating in

28  Cherniss' evaluation, making him subject to possible termination. *Id.* ¶ 7.

At the May 8 Board meeting, Ryan moved that the Board establish an Evaluation Committee—consisting of all members of the Board except Norgaard—to oversee Cherniss' evaluation.  LD, Ex. B.[5]  The Evaluation Committee was to dissolve at the end of a 12-month period.  *Id.*  Board members were clear that the Evaluation Committee was necessary to avoid any conflicts of interest and to protect the SMUSD from a potential retaliation claim from Cherniss.  *E.g.*:

> Mrs. Jack stated that … *with all of the allegations Mr. Norgaard made in his claim, there is an inherent conflict of interest no matter how much Mr. Norgaard says he can be impartial and can be fair in the evaluation….* [I]f Mr. Norgaard is a part of the process *there is the potential that the District will be exposed to liability on the grounds of either retaliatory action or a possible wrongful termination action*…. Mr. Norgaard would be evaluating someone he is suing, someone he is making a claim against.  It would be difficult, if anything came to pass in the future, for the District not to be exposed to any retaliation action or wrongful termination action.  *Id.* (italics added).

The Board voted 4-1 to create the committee, over Norgaard's dissent.  *Id.*  On June 1, 2018, the Evaluation Committee met and discussed Cherniss' evaluation.  The Board had been ready to deliver that final review this past week.  *Id.*

On June 5—and nearly *one month* after the formation of the Evaluation Committee—Norgaard filed this lawsuit, claiming that Cherniss violated a grab-bag of constitutional rights.  He also demanded urgent *ex parte* relief mandating that he participate in Cherniss' review.  As shown below, the extraordinary relief he requests is unwarranted and his request for an injunction should be denied.

## III.   THE COURT SHOULD DENY NORGAARD'S MOTION.

A preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Contrary to Norgaard's assertion, Mem. 4 n.1, the Ninth Circuit requires that a movant meet every one of the five elements under the *Winter* test.  *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (same).

---

[5] At the same meeting, the Board also established a Litigation Committee to oversee the defense of the litigation that Norgaard was pursuing.  LD, Ex. B.

1    Norgaard's motion should be denied at the outset because it fails the most

2  basic element of the test—timeliness.  Norgaard learned *over five weeks ago* of the

3  decision (the Board's May 8 vote creating a special committee to finish Cherniss'

4  evaluation) that he now seeks to enjoin.  Norgaard's tactical choice to wait several

5  weeks to file suit is solely responsible for the "emergency" he imposes on the

6  Court.  Had he wished to pursue this rare remedy, the time to do so was early May,

7  not June 5, when the relief he seeks is all-but moot.

8    Norgaard's application should also be denied because he likewise fails to

9  meet his burden under the other four *Winter* elements:

10   • He presents no *evidence* of his purported First Amendment claims; ignores a

11    mountain of contrary evidence; and the one and only case authority he cites

12    to support his claim *rejected* the very relief he seeks.

13   • He also cannot show irreparable injury.  Norgaard commented on Cherniss'

14    evaluation in April, and his fellow board members heard him out, but largely

15    disagreed, given how his views so deviated from the "Superintendent of the

16    Year" tag Norgaard had given Cherniss *before* Cherniss investigated him.

17   • The public interest and a balance of equities also disfavor any injunction.

18    The order Norgaard seeks is vague, intrudes on local governmental affairs,

19    would defy the defendants' free speech rights not to have to listen to him,

20    and, worst of all, would require Cherniss to be evaluated by a person who is

21    being investigated for retaliating against him.

22  This is not a close call under any one of the five *Winter* factors.

23   **A.    Norgaard Waited Too Long to File This *Ex Parte* Application.**

24    "Lawyers must understand that filing an ex parte motion ... is the forensic

25  equivalent of standing in a crowded theater and shouting, 'Fire!'  There had better

26  be a fire." *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492-93

27  (C.D. Cal. 1995).  In order to justify such relief, "it must be established that the

28  moving party is without fault in creating the crisis." *Id.* The *Mission Power* rule is

one of the most well-established and oft-cited in the District, and it was Norgaard's burden to address it in his moving papers,[6] which he has now twice failed to do.

Norgaard is entirely at fault for the urgency of this motion. He waited over five weeks to file his *ex parte* application—and even then failed to serve it properly. His own papers admit that the Board formed the Evaluation Committee (over his dissenting vote) on May 8, 2018, at a meeting *he attended*. ND ¶ 5. Nonetheless, Norgaard did not file a complaint until June 5 and did not file the instant application until June 11. In the weeks he delayed, the Committee all but completed its work, with the president ready to deliver the review. *Supra* at 8-9.

The record evidence—on which Norgaard bears the burden—does not show diligence. To the contrary, he concedes that, on May 8, the Board voted, citing its conflict-of-interest policy, to create the special evaluation committee. ND ¶ 5; LD Ex. B. Norgaard is a lawyer, ND ¶¶ 1-2, so he knows the need to act quickly to secure any sort of emergency court relief. Norgaard had counsel retained *weeks before* May 8; counsel was communicating with SMUSD weeks before, *id.*, and had even gone so far in late April as to serve a draft complaint against Cherniss, de la Torre, and the Board, making many of the claims reasserted here. CD Ex. I.

Nothing stopped Norgaard—other than his own tactical choice—from filing weeks ago a federal court complaint seeking the proposed order he now seeks. Yes, he had to wait to file a money damages action under state law in light of California Tort Claims Act, *see* Cal. Gov. Code §§ 905, 945.4, but he has no excuse—none— for delaying this federal TRO, *see Harris v. State Personnel Bd.*, 170 Cal. App. 3d 639, 643 (1985) (injunctive relief exempt from CTCA).

In the five weeks that they delayed, what have Norgaard and his counsel done? Certainly not alert the defendants that a complaint and motion for injunctive

---

[6] *E.g.*, *id.* at 493 (emergency relief is "not intended to save the day for parties who have failed to present requests when they should have"; thus, "[t]o show that the moving party is without fault," he must explain "the creation of the crisis—the necessity for bypassing regular motion procedures").

relief would be forthcoming, properly notice a motion for injunctive relief, or meet and confer on the proposed order or a briefing schedule, as the rules require.[7]

Rather, Norgaard has continued to attend board and school related meetings despite his suggestions to the contrary, LD ¶ 17, and he and counsel have fed one false story to the press after another, damaging the District and its employees.[8]

Worse still, Norgaard sat idly by while the special committee was completing its work. He knows the evaluation process is done in the spring semester. ND ¶ 8. The semester ended May 31, LD ¶ 17, about a week *before* he filed suit.

In the undersigned counsel's first meet-and-confer with Norgaard's counsel on June 12, we brought these fatal timeliness problems with Norgaard's application to counsel's attention and asked them to withdraw the motion. Unrepentant,

---

[7] *E.g.*, *Guarantee Co. of N. Am. USA v. Wall*, 2013 WL 12205048, at *1 (C.D. Cal. Oct. 22, 2013) ("Plaintiff had sufficient notice of the problems it recounts in its relationship with Defendants for Plaintiff to have filed its Complaint and a regularly-noticed motion for preliminary injunction."). Indeed, had Norgaard filed his complaint and preliminary injunction motion on May 11, for example, he could have set it for hearing on June 8—a week ago. *See also* C.D. Cal. L.R. 7-19.1; https://www.cacd.uscourts.gov/honorable-fernando-m-olguin.

[8] This public smear campaign is quintessential retaliatory behavior. Norgaard's counsel has falsely told the press that SMUSD "never received any allegations of sexual harassment," that Cherniss and de la Torre "fabricate false claims of allegations of sexual harassment," and that "the superintendent's office continued to make false statements to the media." CD Ex. J. Yet these are what the facts are— all omitted from Norgaard's press blitzes and his legal filings in this case:
- Norgaard "did, at times, engage in unsolicited hugging and kissing of female [SMUSD] employees," making them uncomfortable.
- Norgaard "was commonly described as someone who at times fails to recognize professional boundaries."
- "I do believe that the kisses were sexually motivated. Why else would have kiss me on the lips? How many people do you know who get kissed on the lips by their [boss] at work?" *Supra* at 6-7.
Trying to whitewash his acts of retaliation and rewrite history, Norgaard and counsel have also told the press that Norgaard was "critical" of Cherniss in the past—yet again conspicuously omit that Norgaard, *just weeks before these events unfolded*, nominated Cherniss to be "Superintendent of the Year." *Id.* at 3.
Norgaard and counsel are even now spinning this Court's adverse rulings: "The court has simply asked us to follow a slightly different procedure to file a temporary restraining order." CD Ex. J.

OPP. TO PLS.' TRO APPLICATION
2:18-CV-04987-FMO (GJSX)

Norgaard presses ahead, despite a wall of authority making it clear that his tactical delay flatly bars the extraordinary relief he seeks.  *E.g.*, *Kelly v. Univ. Press of Miss.*, 2016 WL 9223795, at *2 (C.D. Cal. May 3, 2016) (where plaintiff delayed taking legal action for a month and then filed without providing proper notice, *Mission Power* bars TRO).[9]  Indeed, courts in this District have denied TROs where a plaintiff waited just *six days* after notice of the alleged harm.  *See Ins. Servs. Office, Inc. v. ISO Rater Corp.*, 2016 WL 9185311, at *1 (C.D. Cal. Mar. 4, 2016). Here, Norgaard not only waited *five weeks* to file this TRO—he waited *six days* to serve his refiled TRO application after the Court denied his first one.

Norgaard's application should be denied.  Sanctions are also appropriate and in the Court's discretion in denying untimely "emergency" applications of this sort. *See Bus. Guides, Inc. v. Chromatic Commc'ns Enterps.*, 892 F.2d 802, 812 (9th Cir. 1989); *Mission Power*, 883 F. Supp. at 492; Fed. R. Civ. P. 11(b), (c)(3).  On these facts, some modest sanction is warranted.  Litigation is being used as a weapon to intimidate a list of improperly named individual defendants, who have done nothing more than follow the law.  Moreover, the rush relief is being sought to deny defendants usual process.  *Cf.*, *e.g.*, *Levian v. City of Los Angeles*, 2015 WL 12662339, at *2 (C.D. Cal. Sept. 24, 2015) (such applications are disfavored because they "bypass '[s]afeguards that have evolved over many decades' by depriving the opponent of an opportunity to rebut the movant's allegations.").[10]

### B.    Norgaard's Claims Have No Merit.

Norgaard's complaint is an odd assortment of barely articulated claims, almost all of which he does not cite as a basis for the relief sought in this TRO

---

[9] *See also Miramar Brands Grp., Inc. v. Fonoimoana*, 2016 WL 9308016, at *1 (C.D. Cal. June 24, 2016) ("Plaintiff clearly had ample notice that Defendant planned to [infringe] but chose to wait … to try to get an injunction.").

[10] Defendants are also hamstrung in analyzing Norgaard's claims because he redacted most of the section in his complaint titled "The Harm" and has not served defendants with an unredacted copy.  Dkt. 1, ¶ 39; C.D. Cal. L.R. 79-5.2.2.

OPP. TO PLS.' TRO APPLICATION
2:18-CV-04987-FMO (GJSX)

application.[11]  For purposes of this pending motion, Norgaard focuses on only his First Amendment claim.  He contends that defendants retaliated against him after he served the District and Cherniss with his state court draft lawsuit.  Mem. 5.

Norgaard's claim is nonsense—both factually and legally.  As he concedes, he is under investigation for retaliating against those who complained about and investigated his acts of sexual harassment.  He has threatened the job of the very Superintendent who helped lead the investigation, and these threats came soon after Norgaard formally proclaimed that Cherniss was the best Superintendent in the County.  Norgaard has refused numerous requests that he not interact with his accusers, and he has not only sought them out to hover around them or dispute their allegations, he has called the family member of one accuser to plead his case.  He also filed a pre-complaint notice of lawsuit against SMUSD and Cherniss.

Against this backdrop, Norgaard suggests that the Board (and all defendants) violated his First Amendment rights when the Board invoked its clear powers under California law and the Board's bylaws to exclude him from the Cherniss evaluation process, when he declined to recuse himself from voluntarily.  It comes as no surprise that Norgaard cannot cite a single case to support this untenable tort theory.

### 1.   **Legal Background**

Three guideposts help guide the Court's review of Norgaard's claim.  *First*, it "is difficult to think of a greater intrusion on state sovereignty than when a federal

---

[11] For example, he appears to assert a claim under the Privileges & Immunities Clause of the Constitution, Compl. ¶ 52, which for almost 150 years has only permitted suits against states for discriminating against citizens of other states.  *See Slaughter-House Cases*, 83 U.S. 36, 66, 74 (1873).  He also asserts a claim for a generic right of "privacy," Compl. ¶ 52, even though the Supreme Court has rejected such claims and instead limited constitutional privacy to zone of privacy in "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education," *Paul v. Davis*, 424 U.S. 693, 713 (1976).  And he claims a non-specific constitutional harm to his reputation, Compl. ¶ 53, even though "reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment," *Siegert v. Gilley*, 500 U.S. 226, 233 (1991).  These and other defects will be addressed in defendants' forthcoming motion to dismiss.

OPP. TO PLS.' TRO APPLICATION
2:18-CV-04987-FMO (GJSX)

court instructs state officials on how to conform their conduct to state law." *Pennhurst St. School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see Connick v. Myers*, 461 U.S. 138, 143 (1983) ("government offices could not function if every employment decision became a constitutional matter"); *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986) ("The commission of a federal judge is not a 'general assignment to [do] good.'… [Courts] must not intrude unnecessarily on state functions."). Yet, Norgaard's claim pivots on his (erroneous) reading of the Board's bylaws and whether the Board had good-faith bases—*e.g.*, adhering to California anti-discrimination law—in forming the special committee.

*Second*, First Amendment challenges to recusal rules are regularly rejected—and, of course, Norgaard cites *none* of these authorities. *E.g.*, *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 124 (2011) (rejecting First Amendment challenge to censure of city council member who refused to recuse himself; noting "virtually every State has enacted some type of recusal law, many of which … require public officials to abstain from voting on all matters presenting a conflict of interest"); *Bauer v. Shepard*, 620 F.3d 704, 718 (7th Cir. 2010) ("The recusal clause applies to a judge in his role as public employee…. The state, as employer, may control how its employees perform their work, even when that work includes speech (as a judge's job does)."); *Family Tr. Found. of Kentucky, Inc v. Wolnitzek*, 345 F. Supp. 2d 672, 702 (E.D. Ky. 2004) (Kentucky "recusal provisions ensure impartiality without restricting constitutionally-protected speech"); *Liteky v. United States*, 510 U.S. 540, 544 (1994) (recounting history of recusal statutes since 1792).

*Third*, the First Amendment does not protect "speech that owes its existence to … public … professional responsibilities"—such as being the member of a school board and wanting one's voice heard at a meeting. *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006); *see Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 531 (9th Cir. 2015) ("[A] legislator lacks a First Amendment right to cast a vote on any given matter before the legislature").

1    Norgaard's claims run afoul of all of these rules.

2        2.    **The Numerous Reasons Norgaard's Claim Fails.**

3        a. Protected Speech Was Not Impeded.  The first two elements of Norgaard's

4    retaliation claim are: "(1) he engaged in constitutionally protected activity; (2) as a

5    result, he was subjected to adverse action by the defendant that would chill a person

6    of ordinary firmness from continuing to engage in the protected activity." *Blair*,

7    608 F.3d at 543; Mem. 5, 20-23.  He loses at the outset, because, as shown above—

8    in caselaw he never addresses—his speaking at Board meetings or even voting on a

9    specific issue is *not protected speech*.  *Supra* at 15; *Chula Vista*, 782 F.3d at 531

10   ("a legislator has no right to use official powers for expressive purposes").

11       Even assuming his vote or comments to his fellow Board members about

12   Cherniss were protected speech (and they were not), he still does not show, with

13   any evidence, how a person of "ordinary firmness" would be chilled from pursuing

14   the state court lawsuit he drafted, because the Board later invoked its recusal rules

15   to exclude him from the final part of Cherniss' review.  The Board's recusal rule—

16   which Norgaard tellingly never addresses in his papers—states: "[a] Board member

17   *shall* abstain from any official action in which his/her private or personal interest

18   may conflict with his/her official duties." LD Ex. A (Bylaw 9720) (italics added).

19       Norgaard had an actual and obvious conflict of interest as of May 8—by then

20   he had attacked Cherniss in open Board meetings, accused Cherniss of causing him

21   "extreme[] pain[]," and he and Cherniss debated whether the first investigation into

22   Norgaard's conduct showed misconduct.  LD Ex. B at 11.  And this was just at the

23   May 8 meeting itself.  Indeed one other board member noted "this dialog[ue] may

24   be evidence in itself as to why [we] need to have a separate committee." *Id*.

25       But the bylaw at issue here did not require an actual conflict for the Board to

26   invoke it.  The bylaw cites 92 Cal. Op. Att'y Gen. 19 (2009).  LD Ex. A.  That

27   opinion calls for recusal even in the absence of an actual conflict, if "*an appearance*

28   of impropriety or conflict would arise by the member's participation … and voting

1    upon" any matter.  92 Cal. Op. Att'y Gen. at *4 (italics added).

2         Norgaard says again and again that he could not fire Cherniss alone and thus

3    there was no real conflict.  Mem. 9-10.  Yet that is no escape for him either.  This

4    Court should not delve into a debate about how a duly elected Board voted 4-to-1 to

5    apply its own bylaws.  *Supra* at 14-15.  In any event, California's Attorney General

6    has made clear:  "Actual injury is not the principle [that conflict-of-interest] law

7    proceeds on.  Fidelity in the agent is what is aimed at, and as a means of securing it

8    *the law will not permit him to place himself in a position in which he may be*

9    *tempted by his own private interests to disregard those of his principal*."  92 Cal.

10   Op. Att'y Gen. at *5.  "[A] common law conflict of interest may usually be avoided

11   by [the official's] *complete abstention* from any official action with respect to the

12   transaction or any attempt to influence it."  *Id.* (italics added).

13        Again, Norgaard is a lawyer.  When his fellow board member and lawyer,

14   Ms. Link, asked him at the May 8 meeting, if he were the District's attorney, and

15   the Board asked him if he should be permitted to evaluate Cherniss, *Norgaard did*

16   *not answer*.  LD Ex. B at 10.[12]  This was a telling moment.  And it is clear that

17   person of ordinary firmness would not drop his state law lawsuit because he was

18   asked (very much rightfully so) to adhere to duly enacted recusal rules.

19        The one and only case that Norgaard cites to support his claim—*Blair v.*

20   *Bethel School District*, 608 F.3d 540, 545 (9th Cir. 2010)—confirms this.  In *Blair*,

21   an elected school board chose to demote a board member from vice president.  He

22   challenged it as an affront to his rights, and the Ninth Circuit not only noted its

23   reluctance to police such local affairs, but said this is a "minor indignity" and "de

24   minimis deprivation" that cannot give rise to a First Amendment claim.  *Id.* at 544.

25        As in *Blair*, Norgaard suffered an action "taken by his peers in the political

26   arena" where a committee was formed "by a procedurally legitimate vote" and "the

27   _____

28   [12] Norgaard moved and voted to accept these minutes as a true account of the
     meeting.  LD ¶ 17.

1  ordinary functioning of the democratic process." *Id.* at 543-44.  The only

2  distinction between *Blair* and this case is that here the Board was enforcing a pre-

3  existing conflict-of-interest bylaw requiring abstention, as well as preventing a

4  violation of California state anti-discrimination law victimizing its employee.

5       Norgaard is far from the "prototypical plaintiff" in a free-speech retaliation

6  case, such as "a government worker who loses his job." *Id.* at 544.  Indeed, in a

7  remarkable turn, he compares himself to the plaintiff in *Bond v. Floyd*, 385 U.S.

8  116 (1966), a case cited in *Blair*, which came at the end of the Jim Crow era, in

9  which the Georgia Legislature refused to administer the oath of office to or seat an

10  African American legislator because he criticized the Vietnam War.  *Cf. Tabaddor*

11  *v. Holder*, 156 F. Supp. 3d 1076, 1081 (C.D. Cal. 2015) (recommendation that

12  Iranian-American immigration judge recuse herself from all cases involving Iranian

13  officials violated her First Amendment expression and association rights).

14       Unlike in *Bond*, Norgaard has not been deprived of any privileges of office.

15  He has continued to perform all his duties as an elected official—even winning on

16  split votes on unrelated items at a Board meeting this very week.  LD ¶ 17.  The one

17  exception, given the way he has ignored other directives not to impede the

18  investigations, is that he was not included in the final steps of completing Cherniss'

19  review over the last month.  The First Amendment does not protect such de

20  minimis restrictions on his Board work, especially when they are in aid of neutral

21  local rules (here, recusal rules) applied by local, democratic bodies.  *Supra* at 14-15.

22       Confirming the de minimis impact on Norgaard's participation are his own

23  statements at the May 8 meeting.  He said if allowed to participate in the evaluation,

24  he would "not [be] arguing or evaluating" Cherniss.  Instead, he was "only talking

25  about submitting factual statements, that is it."  But Norgaard admits that he had

26  "already participated and personally hand delivered comments."  LD Ex. B at 10.

27       Norgaard's fellow board members cannot be compelled by court order—or

28  by common dignity—to always let him bullyingly have the last word.  *See*

- 18 -

*Montgomery v. Pac. Elec. Ry. Co.*, 258 F. 382, 391 (9th Cir. 1919) ("The right of others to listen or to decline to listen is as sacred as that of free speech.").

    b. Defendants Did Not Act With Bad Intent.  The third element of his retaliation claim requires a "clear showing," *supra* at 9, that "there was a substantial causal relationship between the constitutionally protected activity and the adverse action," *Blair*, 608 F.3d at 544; Mem. 5, 24-25; *Thomas v. Carpenter*, 881 F.2d 828, 829 (9th Cir. 1989) (plaintiff must prove action "was motivated by an intent to retaliate for [the plaintiff's] exercise of constitutionally protected rights").

    In deciding to form its special committee, the Board cited concerns with Norgaard's bias, "inherent conflict of interest," and inappropriateness of a Board member evaluating an employee that he is presently suing.  LD Ex. B at 9-11.[13]  As shown above, the Board's decision tracked its own conflict-of-interest rules, California law, and basic common sense.  Norgaard cannot possibly show—much less show with *clear* evidence—that he can prevail on this bad intent element.

    Were there any doubt (and there should be none), the Board members also expressed concerns about an exposure to liability in a retaliation action brought by Cherniss if they did not exclude Norgaard.  *Id.* at 8-11; *supra* at 9.  Norgaard cites no California law to show that this additional good-faith basis for the recusal is pretext.  To the contrary, under the Fair Employment and Housing Act it is illegal to retaliate against an employee for protected activity.  *See* Cal. Gov. Code § 12940(h).  California interprets retaliation broadly, including "conduct that the employee reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1043 (2005).  A negative job evaluation—

---

[13] Again, Norgaard's brief does not cite the Board bylaw on conflicts of interest or recusal, even in the section of the brief with "conflict of interest" in the title.  His failure to do so is further grounds to consider a sanction. *See Gonzalez v. Diversified Real Prop. Mgmt. & Bus. Servs., Inc.*, 2010 WL 10105755, at *5 (C.D. Cal. Jan. 4, 2010); Cal. Rules of Prof'l Responsibility R. 5-200(B).

OPP. TO PLS.' TRO APPLICATION
2:18-CV-04987-FMO (GJSX)

1    exactly what Norgaard wants this Court to allow him to give Cherniss—can be an

2    adverse employment decision under the FEHA.  *Id.* at 1060-61.

3        Having no real evidence on this intent element, Norgaard tips his hand in

4    arguing with no citation that he does not even *need* to prove the element because

5    "whether [Defendants] intended to punish Plaintiff is immaterial."  Mem. 8, 13-14.

6    He is mistaken.  A "defendant's intent *is* an element of the claim."  *Mendocino*

7    *Envtl. Ctr. v. Mendocino Cty.*, 14 F.3d 457, 464 (9th Cir. 1994).

8        **C.    Norgaard Cannot Show Irreparable Injury.**

9        Norgaard makes no real showing of constitutional injury.  Indeed, the Court

10   denied his first TRO request, in part, because his application "contain[ed] only

11   allegations and arguments" when injunction motions "must be supported by

12   evidence." Dkt. 23 at 2.  While Norgaard adds a few more lines of argument and

13   accusations, his brief's section on injury does not cite one piece of evidence.  His

14   submission is, in essence, a motion for reconsideration.  Any injury, moreover, is of

15   Norgaard's own making.  Norgaard demands urgent action from the Court, but sat

16   on his hands and did nothing for over a month while the Board's evaluation

17   committee completed its work.  In any event, Norgaard participated in that work, in

18   the beginning, by providing his handwritten comments and other oral comments.

19   LD Ex. B at 9; *supra* at 8.

20       It is not the case, as Norgaard suggests, Mem. 11, that irreparable injury has

21   no role in First Amendment claims.  The Ninth Circuit has explained that *Elrod v.*

22   *Burns*, 427 U.S. 347 (1976), is limited since it involved core political speech on

23   matters of public concern, *see id*. at 374 n.29—*i.e.*, "free speech rights of public

24   employees threatened with discharge because of political party affiliation."  *Church*

25   *of Scientology of Calif. v. United States*, 920 F.2d 1481, 1488 (9th Cir. 1990).  As

26   the Ninth Circuit has reaffirmed, the "mere assertion of First Amendment rights

27   does not automatically require a finding of irreparable injury."  *CTIA-The Wireless*

28   *Ass'n v. City of Berkeley, California*, 854 F.3d 1105, 1123 (9th Cir. 2017).

OPP. TO PLS.' TRO APPLICATION
2:18-CV-04987-FMO (GJSX)

### D.     The Balance of Equities and the Public Interest Favor Defendants.

"With respect to the balance of the equities and the public interest, these two factors merge into one inquiry… where, as here, the government is the opposing party." *Loan Payment Admin. LLC v. Hubanks*, 2015 WL 1245895, at *16 (N.D. Cal. Mar. 17, 2015); *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Four main reasons show why equity and the public interest do not favor an injunction.

*First*, the requested injunction would place Norgaard in a position where he could retaliate against a public employee for investigating allegations of sexual harassment.  Neither the equities nor the public interest are supported by placing an individual in a position of power with such an obvious conflict of interest.

*Second*, the requested injunction would overrule a democratic vote by an elected body, an unwarranted intrusion.  *Cf. supra* at 14-15; *Blair*, 608 F.3d at 544-45, ("[T]he First Amendment does not succor casualties of the regular functioning of the political process."); *Connick*, 461 U.S. at 143 ("government offices could not function if every employment decision became a constitutional matter").  The Board voted 4 to 1 that recusal was required under its rules. LD Ex. B at 11. Norgaard argues this decision was in error (omitting any mention of the recusal rules), but this Court should not give him a do-over.  This is especially the case when his fellow board members, who outvote him, already heard his biased complaints about Cherniss and do not adopt them.  Forcing the Board to 4-to-1 vote yet again would also be a wasteful, empty act—much like the precious school resources that this misguided lawsuit is wasting.  LD ¶ 18.

*Third*, the requested injunction ignores that the evaluation is all-but complete. And the Court cannot grant Norgaard relief without compelling the Board to speak with Norgaard on this topic and to listen to his discredited views.  Such an order would disregard *defendants'* right to be free of compelled speech.  *Supra* at 18-19.

*Fourth*, the Court would have to involve itself in the impossible task of policing here *not* a clear statutory mandate, but what Norgaard says—without any

OPP. TO PLS.' TRO APPLICATION
2:18-CV-04987-FMO (GJSX)

proof—are the "policy, tradition, and practices" of the District.  Dkt. 25-2 at 2 (Proposed Order).  The parties disagree on all of these subjects.  For example, while Norgaard argues he has a constitutional right to "vote" on the evaluation, Mem. 7, 10, his fellow board members confirm that the Board has *never* voted on the evaluation, as it is a private matter for the Superintendent's file.  LD ¶ 7.  Resolving such debates will turn this Court (improperly) into an umpire of a local, democratic body.  *Cf., e.g.*, *Cal. Primary Care Ass'n v. Douglas*, 2012 WL 12930701, at \*5 (N.D. Cal. May 10, 2012) ("The balance of the equities and the public interest also weigh against granting an injunction as to avoid unnecessary intrusion into the activities of a government agency."); *Pennhurst*, 465 U.S. at 106.

## IV.    CONCLUSION

The Court should deny Norgaard's request for a TRO and an injunction.  It also should consider some modest sanction here, given the tens of thousands of dollars he has cost the District—not to mention the waste and rush of time needed to respond to this "emergency" motion, or to address the many authorities he omits.

Dated:  June 15, 2018

O'MELVENY & MYERS LLP

By:      /s/  Matt Kline
         Matt Kline
         *Attorneys for Defendants*